UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


UNITED STATES,

  Plaintiff,


v.              Case No.  6:17-cr-95-ORL-PGB-GJK


BILLY LEON DYER,

  Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

  The Defendant, BILLY LEON DYER, by and through his undersigned counsel, respectfully submits this sentencing memorandum for this Honorable Court's consideration. Mr. Dyer requests this Court determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553, and thus impose a sentence of 15-years of imprisonment.

## STATEMENT OF FACTS

  1.  On September 20, 2017, Mr. Dyer pled guilty to the enticement of a minor for the production of a visual depiction of sexually explicit conduct in violation of 18 U.S.C. § 2251. *See* Doc. 63. At seventy-eight years of age, Mr. Dyer is facing a minimum mandatory sentence of 15 years of imprisonment and a maximum sentence of 30 years of incarceration. *See* 18 U.S.C. §§ 2251.

  2.  The Presentence Report (PSR) calculates Mr. Dyer's total offense level as a level 38 with a criminal history category of I. PSR at ¶¶ 46; 50. Thus, Mr. Dyer faces an advisory

guideline sentencing range of 235 to 293 months of incarceration. *Id*. at ¶ 79. The parties have no objections to the advisory guideline range.

3.      Notwithstanding the advisory guideline range, Mr. Dyer is facing a mandatory sentence of 15 years in prison. *See* 18 U.S.C. § 2251.

## MEMORANDUM OF LAW

This memorandum establishes that a variance to a 15-year sentence is warranted in Mr. Dyer's case pursuant to 18 U.S.C. § 3553, notwithstanding the advisory guideline range. Based on Mr. Dyer's age and his significant medical problems, a 15-year term of incarceration is the equivalent of a life sentence. Thus, the application of section 3553's statutory framework is especially critical, since its factors support Mr. Dyer's request for a minimum mandatory sentence.

I.      ***Booker and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a)***

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005), a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).[1]

---

[1] As the Supreme Court recently reaffirmed,"[s]entencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence. This durable tradition remains, even as federal laws have required sentencing courts to evaluate certain factors when exercising their discretion." *Dean v. United* Stats, 127 S. Ct. 1170, 1175 (2017) (internal citation omitted).  Moreover, judicial discretion to consider all information about the case and the offender is a time-honored principle of American law and has historically been understood as a means of ensuring justice in individual cases.  *See Koon v. United States*, 518 U.S. 81,113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.");

To guide a court's discretion, section 3553(a)(2) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established;
> (5) any pertinent [Sentencing Commission] policy statement;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7).

Although Mr. Dyer comprehends the severity of his conduct, he submits that the imposition of an advisory guideline sentence would necessarily violate the requirement that a defendant's sentence be sufficient but not greater than necessary to satisfy the purposes of § 3553(a). *See Pepper v. United States*, 562 U.S. 476 (2011) (a sentencing judge's "overarching duty" under § 3553(a) is "'to impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)").

As this memorandum establishes, a variance is warranted in Mr. Dyer's case based on (1) his history and characteristics, including his exemplary military history and psychiatric

---

*accord Pepper v. United States*, 562 U.S. 476, 487-88 (2011). Indeed, Congress has expressly affirmed a judge's discretion to consider the fullest information possible. *See* 18 U.S.C.§ 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

condition; (2) the injustice of a guideline sentence based on his advanced age and life
expectancy; (3) his low risk of recidivism; and (4) his need for effective care due to his age and
medical condition.

**1.      The Nature and Circumstances of the Offense and the History and Characteristics
of the Defendant**

*The Nature and Circumstances of the Offense*

Mr. Dyer concedes that his crime is serious and his conduct egregious. But the first §
3553 factor is not limited to a mere consideration of a defendant's conduct. Instead, a court must
also consider a defendant's offense conduct against the tapestry of his entire life. As one federal
judge has noted:

> [I]f ever a man is to receive credit for the good he has done, and his immediate
> misconduct assessed in the context of his overall life hitherto, it should be at the
> moment of his sentencing, when his very future hangs in the balance. This
> elementary principle of weighing the good with the bad, which is basic to all the
> great religions, moral philosophies, and systems of justice, was plainly part of
> what Congress had in mind when it directed courts to consider, as a necessary
> sentencing factor, 'the history and characteristics' of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff, J.).

As the following section demonstrates, Judge Rakoff's insight is critical important in
determining Mr. Dyer's sentence since his egregious actions cannot and should not be the
sentencing factor that solely controls this Court's decision.

*The History and Characteristics of the Defendant*

Mr. Dyer is a seventy-eight-year-old college-educated man who had an outstanding
employment history in the United States Air Force and in post-military career prior to his
retirement due to medical issues. *See* PSR at ¶¶ 73-74. Concerning his military career, Mr. Dyer
served in the United States Airforce from 1958 to 1978. He achieved the rank of Captain and

4

received an Honorable Discharge in 1978. *Id*. at ¶ 74. During his career in the Air Force, Mr.

Dyer received multiple medals and commendations as outlined in Table 1:

**Table 1: Military Commendations**

| Award | Description |
|---|---|
| NDSM | Navy Distinguished Service Medal |
| AFM 900-3 | Three Outstanding Unit Awards – for participation in overseas operations |
| AFCM SOG-8 | Eight Air Force Commendation Medals |
| AFGCMw/30LC | Air Force Good Conduct Medal |
| AFLSAw/30LC | 3d Oak Leaf Cluster Status – for longevity of excellent service at different points of his career |
| AFEM | Air Force Emergency Management |
| AFOUA | Air Force Outstanding Unit Award |
| SAMER | Qualified Expert on Weapons |

*See* PSR at ¶ 74, U.S. Air Force DD Form 214, attached hereto as Exhibit 1.

As Table 1 demonstrates, Mr. Dyer had an outstanding 20-year military career as he

received approximately 17 awards and commendations. Such honorable service to his country

supports Mr. Dyer's request for a variance. *See generally Porter v. McCollum*, 558 U.S. 30, 39

(2009) (per curiam); *see also United States v. Williams*, 332 Fed. Appx. 937 (5th Cir. 2009) (the

defendant's "service to his country is admirable and worthy of consideration as a mitigating

factor supporting a downward departure.").

In *Porter*, the Supreme Court recognized the significance of a defendant's military history as a mitigating factor in the context of criminal sentencing. *Porter* determined that trial counsel was ineffective for failing to offer evidence concerning the defendant's military service during the Korean War. In reaching its decision, *Porter* noted that "[i]t is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Id*. at 39 (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). Concerning a defendant's military history, the Court further noted that "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines . . . " *Id*. at 43.

Based on Mr. Dyer's exemplary military service, the question becomes how an individual who displayed commitment and honor could commit such a crime in the latter stages of his life. While the question is necessarily perplexing, a compelling answer lies in another more troubling aspect of Mr. Dyer's history and characteristics. That is, at the time he committed his offense, Mr. Dyer's suffered profound psychological issues. As the PSR notes, Mr. Dyer received a 100% disability rating from the Government based on his psychological issues. *See* PSR at ¶ 68. The Department of Veterans Affair determined that Mr. Dyer was completely disabled based on the following conditions: 1) major depressive disorder with anxiety; 2) neurosis; and 3) dysthymic disorder. *See id*. An analysis of Mr. Dyer's conditions demonstrates their impact on his conduct.

Indeed, the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") asserts that Major Depressive Disorder is "sufficiently severe to cause marked impairment in social or occupational functioning or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features." *See* American Psychiatric Society, *Major Depressive Disorder,* DSM-V (2013). Major Depressive Disorder is characterized by a myriad of factors, including:

- Diminished ability to think, concentrate and make decisions

- Psychomotor agitation or retardation (a speeding or slowing of muscle movement)

- Loss of energy or fatigue

- Feelings of worthlessness (low self-esteem)

- Recurrent thoughts of death, dying or suicide

- Longstanding interpersonal rejection ideation (i.e. others would be better off without me); specific suicide plan; suicide attempt.

*Id*.  Furthermore, Mr. Dyer's Dysthymic Disorder means that his Major Depression persisted more than two years. *Id*.

The impact of Mr. Dyer's mental condition cannot be overstated, since his disorders not only impaired his judgment, but also resulted in suicidal behavior. *See* PSR at ¶ 67. Furthermore, Mr. Dyer's psychological problems were exacerbated by his significant substance abuse issues. The PSR notes that prior to his arrest, Mr. Dyer was smoking marijuana and consuming a significant amount of alcohol daily. PSR at ¶ 69. Notably, Mr. Dyer's substance abuse occurred over a substantial time period. *Id*.

While drug addiction has often been seen as resulting from an addict's lack of willpower and character, experts generally agree that narcotic dependence is a form of mental illness. *See* Nat. Instit. of Drug Abuse, "*Comorbidity: Addiction and Other Mental Illnesses*" (Sept. 2010), hereto attached as Exhibit 2.  As the National Institute of Drug Abuse concludes, addiction is "a complex brain disease characterized by compulsive, at times uncontrollable drug craving,

seeking, and use despite devastating consequences – behaviors that stem from drug-induced changes in brain structure and function." *See id.* at 1.[2]

Mr. Dyer's struggles with psychological issues and substance abuse has had a long-standing and devastating impact on his life. This effect is seen in his criminal actions, which occurred at a time when he was suffering psychologically and abusing drugs and alcohol. In the end, Mr. Dyer was not a mere criminal sinner, but rather a sinner in part of the mental illness and substance abuse problems he suffered. Robert Louis Stevenson, *The Strange Case of Dr. Jekyll and Mr. Hyde,* (Longman, Green & Co 1886) ("If I am the chief of sinners, I am the chief of sufferers also").

**2.    The Need for the Sentence Imposed**

> *A.    To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

In considering whether the requested 15-year sentence constitutes a just penalty, this Court should consider the severe impact of such a punishment based on Mr. Dyer's age. Because Mr. Dyer is 78-years-old, a fifteen-year sentence means that he will not be released from prison until he is in his nineties. Moreover, the notion that Mr. Dyer will actually survive to that time is dubious for two reasons.

First, according to Organization for Economic Cooperation and Development, the life expectancy of males in the United States is approximately 76-years. *See* U.S. Dept. of Health and

---

2 As one infamous addict stated, "[i]f you have never been addicted, you have no clear idea what it means to need junk with the addict's special need. You don't decide to be an addict. One morning you wake up sick and you're an addict."  William Burroughs, *Junky,* prologue p. xxxviii (Ace Books 1953). Although William Burroughs' depiction of addiction was written over sixty years ago, the merit of his description is borne out by subsequent studies demonstrating that addiction is characterized by compulsive drug craving, seeking, and use despite the devastating consequences that stem from such behavior. Nat. Instit. of Drug Abuse, "Comorbidity: Addiction and Other Mental Illnesses" (Sept. 2010).

Human Services, *Life Expectancy Chart*, attached hereto as Exhibit 3. According to the Social Security Administration, a male reaching the age of 65 is expected to live until he is approximately 84-years-old. *See* SSA, *Calculators, Life Expectancy*, attached hereto as Exhibit 4. Thus, according to the Social Security Administration, Mr. Dyer's is only expected to live another 6 years.

Moreover, the incarceration of Mr. Dyer will significantly reduce his limited life expectancy. *See* Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, Am. J. of Public Health 103, no. 3 (March 1, 2013), at 523-528. Dr. Patterson concludes that for every year served in prison, an individual's life expectancy is reduced by two years. *Id.*

In addition to the likelihood that Mr. Dyer will die in prison, this Court should also consider the significant punishment that Mr. Dyer will receive due to the collateral consequences of his conviction. A recent congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), available at http://www.gao.gov/products/GAO-17-691.pdf, summary excerpt attached hereto as Exhibit 5. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id.*

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (Block, J.) (varying downward from guideline range of 33 to 44 months imprisonment to

one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). The *Nesbeth* Court concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *Id.*; *see also* Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002).

In granting a variance in *Nesbeth*, the court asserted that the collateral effects of a criminal conviction can be "devastating" to a defendant. *Nesbeth*, 2016 WL 3022073, at *1. As Judge Block concluded, "[t]oday, the collateral consequences of criminal convictions form a new civil death." *Id.* at *3.

Judge Block's perspective has been confirmed in Mr. Dyer's case. Based on his adjudication of guilt in this matter, Mr. Dyer has lost his social security income of $2000 per month. In addition, the Government has forfeited Mr. Dyer's residence and car which represented a significant portion of his net worth. Thus, Mr. Dyer has not only lost his liberty, but also has been punished by the loss to his income and assets.

B.      *To afford adequate deterrence to criminal conduct*

The issued raised by this § 3553 factor is whether a 15-year prison sentence, as well as the significant financial consequences of Mr. Dyer's conviction, provides adequate deterrence to criminal conduct, or whether additional time as promoted by the sentencing guidelines is necessary to achieve this goal. The question then becomes whether greater prison time equates to greater deterrence. This is not the case.

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id*. at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 6. In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

C.    *To protect the public from further crimes of the defendant*

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also supports Mr. Dyer's request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. In addition to this general empirical evidence, the second part asserts that Mr. Dyer's history and characteristics demonstrate that he poses a low risk of recidivism.

1.    *The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), hereto attached as Exhibit 7. As the following discussion establishes, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See* Ex. 5 at 4; *see also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017) (concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more

effective and less expensive than incarceration").[3] Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *See id.* There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Ex. 7 at 4. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance")*.*

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. Ex. 7 at 5. *See also* R. S. Frase et al, *Criminal History Enhancements Sourcebook* (2015) (discussing studies establishing the crime that "custody is associated with higher rates of re-offending than community sentences.") Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since

---

[3] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

"incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. Ex. 7 at 1, 4.

 2. *Mr. Dyer's low risk of recidivism*

Notwithstanding the foregoing studies, an examination of Mr. Dyer's characteristics establishes that he poses a low risk of recidivism. Mr. Dyer is 78 years old, has a college education, and has an outstanding employment history, and is in a Criminal History Category of I. Based on these factors, Mr. Dyer poses a lower risk of recidivism. *See* USSC *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004). Furthermore, Mr. Dyer's advanced age is especially critical to assessing his risk of recidivism. For all male offenders in Criminal History Category I, the recidivism rate is 15.2%. *See, e.g.*, *Measuring Recidivism* at 28. For those over age 50, however, the rate for Category I offenders is only 6.2%. *See id.*

The United States Sentencing Commission has recognized the advisability of revising the guidelines to take age into account. *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power" of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure. USSG § 5H1.1, *see Measuring Recidivism* at 16

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Dyer, this Court should consider the statistically low risk of recidivism presented by him. *See, e.g.*, *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997,

1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age and noting that likelihood of recidivism was "very low").

As these cases establish, in imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Dyer, this Court should consider the statistically low risk of recidivism presented by him. Indeed, in the absence of a deterrent effect, Mr. Dyer submits that a variance is warranted in his case.

> D.       *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

Based on Mr. Dyer's age, college degree, and long-standing employment, he does not require vocational training or education. A significant sentencing consideration, however, is Mr. Dyer's health problems. *See* § 3553(a)(2)(D) (stating that the sentence imposed must ensure that needed medical care is provided "in the most effective manner"). Mr. Dyer requires significant medical care as he suffers from numerous health issues as detailed in the PSR and in his medical records. *See* PSR at ¶¶ 63-66.

These conditions include, but are not limited to, the following: (1) Abdominal Aortic Aneurysm;[4] (2) Cervical Spondylosis;[5] (3) Spinal Cord Compression; (4) Hypothyroidism; (5)

---

[4] An abdominal aortic aneurysm involves an enlarged area in the aorta's lower region. Symptoms include deep and constant abdomen pain and back pain. *See* Mayo Clinic, Abdominal Aortic Aneurysm, *available at* https://www.mayoclinic.org/diseases-conditions/abdominal-aortic-aneurysm/symptoms-causes/syc-20350688. Risks include potential internal bleeding and blood clots. *Id.*

Diverticulosis; (6) Basal Cell Carcinoma;[6] (7) Polyosteoarthritis;[7] (8) Enlarged Prostrate; (9) Torn Biceps; (10) Torn Rotator Cuffs, (11) Hypertension; and (12) Cataracts.

Because of his medical and psychiatric conditions, Mr. Dyer takes multiple medications as outlined in Table 2 below.

**Table 2: List of Medications**

| Facility | Medication | Use |
|---|---|---|
| Robert Abraham M.D. Orange County Jail | Norvasc 5mg | Indicated for treatment of hypertension and chest pain |
| Robert Abraham M.D. | Xanax 0.25mg | Indicated for treatment of anxiety and panic disorders |
| Health First Viera Hospital | Amlodipine 10mg | Indicated to widen blood vessels and improve blood flow |
| Health First Viera Hospital Orange County Jail | Buspar 10mg | Indicated to treat anxiety |
| Health First Viera Hospital | Levothyroxine 88mmg | Indicated to treat thyroid disorders |
| Health First Viera Hospital | Valtrex 500 mg | Indicated to treat virus infection |
| Orange County Jail, Orlando, Florida (October 2017) | Robaxin 750mg | Muscle relaxant |

Against this backdrop, Mr. Dyer's requested sentence is warranted based on his need to

---

[5] Cervical spondylosis involves age-related wear and tear affecting the spinal disks in the neck. Symptoms include 1) numbness and weakness in extremities; 2) loss of coordination and mobility difficulty; and 3) loss of bladder and bowel control. *See* Mayo Clinic, *Cervical Spondylosis*, *available at* https://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/symptoms-causes/syc-20370787.

[6] Basal cell carcinoma is a type of skin cancer. *See* Mayo Clinic, *Basal Cell Carcinoma, available at* https://www.mayoclinic.org/diseases-conditions/basal-cell-carcinoma/symptoms-causes/syc-20354187

[7] Osteoarthritis is a degenerative disease which occurs when cartilage attached to the bone wears down over time. *See* Mayo Clinic, *Osteoarthritis*, *available at* https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925. Although osteoarthritis can damage any joint in your body, the disorder most commonly affects joints in your hands, knees, hips and spine. *Id.*

receive effective medical treatment. It is doubtful whether such effective medical care will be provided by the Bureau of Prisons. An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. It found that in numerous instances, the Bureau of Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions. *See* U.S. Dep't of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* ii-xix, 32-34 (2008), *available at* https://oig.justice.gov/reports/BOP/a0808/final.pdf.

Moreover, anecdotal evidence and what limited non-governmental research is available also suggest that the actual delivery of health care services in prison falls short of the standards established in government publications defining the health care a prisoner is supposed to receive. *See, e.g.*, Andrew P. Wilper et al., *The Health and Health Care of US Prisoners: Results of a Nationwide Survey*, 99 Am. J. Public Health No. 4, 666 (2009). It follows that this Court should consider the inadequacy of BOP facilities in providing the sort of medical care that Mr. Dyer is likely to need.

In considering Mr. Dyer's request for a variance, it is important to note that the guidelines specifically permit guideline departures based on physical impairment. In particular, USSG § 5H1.4 provides that "an extraordinary physical impairment may be a reason to impose a sentence below the guideline range; e.g., in the case of a seriously infirm defendant, *home detention may be as efficient as, and less costly than, imprisonment*."

Moreover, courts often recognize the importance of imposing sentences below the

guidelines range in cases involving seriously infirm defendants such as Mr. Dyer. *See United States v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004) (in tax fraud case, three level downward departure proper (and possibly more on remand) where "several serious medical conditions make Martin's health exceptionally fragile [and] ...we are not convinced that the BOP can adequately provide for Martin's medical needs during an extended prison term [and] there was a high probability" that lengthy incarceration would shorten the defendant's life span); *United States v. Gee,* 226 F.3d 885 (7th Cir. 2000) (sentencing court's downward departure under §5H1.4 based on defendant's health condition was not abuse of discretion and BOP letter stating that it could take care of any medical problem "was merely a form letter trumpeting [BOP] capability"). As both *Martin* and *Gee* indicate, entrusting the care of Mr. Dyer to the BOP is a risky proposition. Undeniably, the risk is particularly significant in Mr. Dyer's case based on his age and multiple health conditions. Thus, the entrustment of Mr. Dyer's significant medical care to the BOP, through a long sentence of imprisonment, is contrary to the principles of just sentencing as reflected in § 3553.

Mr. Dyer's ability to receive effective care is also limited by his advanced age. *See*, *e.g*, U.S. Dep't of Justice Office of Inspector General, *The Impact of an Aging Prisoner Population on the Bureau of Prisons*, Executive Summary (May 2015). Indeed, the Government, itself, has concluded that "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose." *Id*. at 3. Finally, as previously noted, Mr. Dyer's psychiatric problems and substance abuse issues requires both counseling and medication.

3.        **The Kinds of Sentences Available**

Because a mandatory minimum sentence of 15-years applies to Mr. Dyer's conviction, his requested sentence of 15-years would comply with the law.

<u>CONCLUSION</u>

As the foregoing establishes, the unique circumstances presented in Mr. Dyer's case warrant a variance below the applicable guideline range. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Mr. Dyer respectfully submits that a variance is appropriate pursuant to this significant and paramount sentencing statute.

Respectfully submitted,

*/s/ Fritz Scheller*
Fritz Scheller
Florida Bar No. 183113
Fritz Scheller, P.L.
200 E. Robinson St., Suite 1150
Orlando, Florida 32801
PH: (407) 792-1285
Fax: (407) 513-4146
*Attorney for Defendant*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 14, 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Fritz Scheller*
Fritz Scheller